IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW R. WEIDMAN, SR., | ) | Case No. 1:17-cv-01262 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Andrew R. Weidman, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 42 U.S.C. §1383(c)(3), and Local Rule 72.2(b).

Because (1) substantial evidence supported the Administrative Law Judge's ("ALJ") conclusion that Weidman's description of his symptoms was not entirely consistent with the evidence of record; (2) the ALJ properly applied the treating source rule; and (3) the ALJ met his burden at Step Five of the Sequential Analysis, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

## II.    Summary of the Administrative Record

Weidman applied for DIB on November 12, 2014 (Tr. 184), alleging a disability onset date of September 29, 2013.  (*Id.*)  Weidman alleged disability based on blindness in his left eye,

back injury, mental condition, and high blood pressure.  (Tr. 339)  Weidman's application was denied initially on January 17, 2015 (Tr. 184), and on reconsideration on April 8, 2015.  (Tr. 184)  Weidman filed a written request for rehearing on April 16, 2015.  (Tr. 184)  ALJ Eric Westley heard the case on May 12, 2016.  (Tr. 203-34)  The ALJ denied Weidman's claim on May 20, 2016.  (Tr. 181)  The Appeals Council denied further review on May 3, 2017, rendering the ALJ's May 20, 2016 decision the final decision of the Commissioner.  (Tr. 4-6)

## III.     Evidence

Weidman alleged disability based on blindness in his left eye, back injury, mental condition, and high blood pressure, but only raises issues regarding his back injury, mental condition, and blindness in his left eye on appeal.  Because Weidman has raised only limited issues, it is unnecessary to summarize the entire record.

### A.     Personal, Educational, and Vocational Evidence

Weidman was 48 years old on the date of the hearing.  (Tr. 37, 209)  After the ALJ issued his decision in this case, Weidman turned 50 years old and changed age categories.  Weidman quit school in the tenth grade and did not obtain a G.E.D.  (Tr. 209)  Weidman has worked as a yard jockey or yard laborer, tow motor operator, and truck driver.  (Tr. 227)

### B.     Medical Records Related to Weidman's Medical Impairments

On November 9, 2012, Edward Butler, M.D. examined Weidman upon referral by the Division of Disability Determinations.  (Tr. 446)  Dr. Butler noted that Weidman has been blind since he was stabbed in his left eye, could not detect light from dark, but had good vision in his right eye.  (*Id*.)  Dr. Butler found Weidman's vision was 20/20 in his right eye, 20/0 in his left, and 20/20 in both eyes, uncorrected.  (Tr. 447)  Weidman reported that he cooked daily, cleaned as needed, did laundry daily, and also watched television, listened to the radio, and socialized

with friends.  (*Id.*)  Dr. Butler found Weidman was not in distress, had an antalgic gait on the left side, could walk on heels and toes without difficulty, could perform a full squat, had no trouble changing for the exam or getting on or off the exam table, and had a normal stance.  (Tr. 447-48) The musculoskeletal and mental status findings were normal.  (Tr. 448-49)  Dr. Butler diagnosed Weidman with blindness of the left eye, lumbar disc disease, hypertension, depression, and obesity.  (Tr. 449)  Dr. Butler opined Weidman had mild limitations to pushing, pulling, and lifting.  (*Id.*)

On November 11, 2014, Weidman reported to physical therapist Ashima Narayan that he had a herniated disc, bulging disc, nerve damage, and left leg numbness, and he rated the severity of his pain as three out of ten at the end of the treatment.  (Tr. 399-400)  Ms. Narayan found Weidman was hypersensitive to touch at L5-S1 junction.  (Tr. 400)  She recommended Weidman continue physical therapy two times per week for eight total visits, but Weidman was discharged from physical therapy the following week due to non-compliance with the attendance policy. (Tr. 399, 401)

An X-ray of Weidman's lumbar spine taken on November 9, 2012 showed minor spurring at the L1 and L2 levels and some degenerative arthritic changes involving the facet joints at the L5-S1 level.  (Tr. 404)

On March 13, 2015, Jared Placeway, DO evaluated Weidman regarding his low back pain.  (Tr. 436)  Weidman reported burning, sharp/stabbing low back pain with intermittent muscle spasms that was aggravated by sitting, walking, or driving for prolonged periods.  (Tr. 436-37)  Dr. Placeway noted that Weidman was terminated from physical therapy due to non-attendance.  (Tr. 436)  Weidman reported his TENS unit and Vicodin alleviated his symptoms. (*Id.*)  Dr. Placeway noted Weidman had active problems, including low back pain, lumbar disc

herniation, and hypertension.  (Tr. 437)  Dr. Placeway and a nurse practitioner continued to treat Weidman throughout the relevant period.  (Tr. 461-500, 506-514)

On June 4, 2015, Xiaozhou Tan, M.D. evaluated Weidman regarding his complaint of back pain after driving for a long time.  (Tr. 498)  Dr. Tan found left-sided low back pain with left-sided sciatica.  (Tr. 499)

A July 2015 MRI of Weidman's lumbar spine showed lumbar spondylosis and no focally severe stenosis or L5 or S1 nerve root compromise.  (Tr. 468-69)

Weidman had lumbosacral epidural steroid injections on July 29, 2015 (Tr. 479-80) and September 2, 2015 to treat the displacement of his lumbar intervertebral disc without myelopathy and thoracic or lumbosacral neuritis or radiculitis.  (Tr. 471-72)  Weidman also underwent lumbar diagnostic facet joint nerve block procedures on November 4, 2015 (Tr. 76-77) and December 23, 2015.  (Tr. 46-47)

On September 8, 2015, Jared Placeway, DO again examined Weidman regarding his complaint of low back pain and opined that Weidman could: stand for 5-6 minutes at one time and 30 minutes over an 8-hour period; sit for 30-45 minutes at one time or 1 to 1.5 hours over an 8-hour period; and walk for 30 minutes at one time or over an 8-hour period. (Tr. 465, 469)  Dr. Placeway found Weidman could ambulate without devices and independently perform activities of daily living.  (*Id.*)  Dr. Placeway found Weidman had an antalgic gait, tenderness over the L3, L4, L5, and LS spinal junctions and pain during facet loading during L3/4, L4/5, and L5/S1.  (Tr. 468)  A July 2015 MRI of Weidman's lumbar spine showed lumbar spondylosis and no focally severe stenosis or L5 or S1 nerve root compromise.  (Tr. 468-69)  Dr. Placeway opined that Weidman had "moderately severe functional limitations" and could work at a sedentary level, subject to his need to frequently change positions.  (Tr. 469)

4

On May 23, 2016, Mindy Toabe, OD performed a comprehensive eye and vision examination on Weidman.  (Tr. 500-505)  Weidman reported constant and moderate blurred vision in his right eye, which became worse throughout the day.  (Tr. 500-501)  Weidman's vision was 20/20 in his right eye.  (Tr. 501)  Dr. Toabe found Weidman did not need prescription strength spectacles, and prescribed over the counter readers.  (Tr. 504)  She noted that Weidman had early cataract formation consistent with his vision and age, which did not require surgery at that time.  (*Id*.)

On March 8, 2016, Dr. Placeway diagnosed Weidman with right lateral epicondylitis and multifactorial lower back pain with herniated nucleus pulposus and myofascial pain with pain significantly increased with facet loading in the lower lumbar spine and positive response to medial branch blocks.  (Tr. 41)

### C.     Opinion Evidence

#### 1.     Jared Placeway, DO – Treating Physician

On September 17, 2015, Dr. Placeway prepared an opinion regarding Weidman's physical impairments.  (Tr. 458)  Dr. Placeway opined that Weidman could lift and/or carry 10-20 pounds, 10-15 pounds occasionally, and less than 10 pounds frequently.  (Tr. 458)  Dr. Placeway opined that Weidman could stand, walk, or sit for a total of three to four hours or thirty minutes without interruption.  (*Id.*)  Dr. Placeway opined that because of Weidman's lumbar herniated discs and facet arthropathy, he could only occasionally climb or balance and could never stoop, crouch, kneel, or crawl.  (*Id.*)  Dr. Placeway opined that there were no environmental restrictions that affected Weidman's impairments.  (*Id.*)  Dr. Placeway opined that Weidman would miss about two days of work per month, be off task between 15% and 20% of an eight-hour workday, would need to be able to use his hands 100% of an eight-hour work day,

and would need to take unscheduled breaks about two times per day.  (Tr. 459)  Dr. Placeway
stated that Weidman's difficulty sitting for more than a few minutes and his need to frequently
change positions supported the opinions in the assessment.  (*Id.*)

### 2.      Richard N. Davis – State Agency Examining Psychologist

On February 12, 2015, clinical psychologist and state agency examining consultant,
Richard N. Davis, evaluated Weidman's mental impairments.  (Tr. 390)  Weidman indicated that
it was his fourth time applying for disability benefits and that he went back to work each time he
was denied.  (*Id.*)  He reported that he was kicked out of school in 1985 for punching a teacher,
then graduated from welding school and found work in that area.  (*Id.*)  Weidman stated he later
obtained a license and drove a truck most of his life.  (*Id.*)  He reported that he was injured while
working on a dock and could no longer do that kind of work.  (*Id.*)  Weidman reported that he
was last employed in September of 2013 at the Volunteers of America.  (Tr. 391-92).  Weidman
claimed he does not have trouble getting along with people in positions of authority or with
coworkers.  (Tr. 391, 394)  Weidman reported that he was divorced and had three children.  (Tr.
392)

Weidman reported that he had never been hospitalized for emotional problems or been
under the care of a mental health professional.  (Tr. 392)  He stated that was primarily angry and
didn't feel that he needed to see a mental health professional even though he sometimes gets
depressed.  (*Id.*)  He rated his depression at four out of ten.  (*Id.*)

Dr. Davis found Weidman displayed average grooming, abrupt mannerisms, and was
basically being cooperative.  (Tr. 391)  Dr. Davis found Weidman liked to digress and express
his opinions on things about which he was angry and that felt unfair to him.  (*Id.*)  Dr. Davis
found Weidman presented data suggesting he has been impulsive at points in his life.  (*Id.*)

Weidman's flow of conversation and thought were satisfactory.  (*Id.*)  Weidman reported that his appetite was satisfactory, but he sometimes had difficulty sleeping because of pain.  (*Id.*)  Dr. Davis found Weidman was very suspicious of other people and obsessed about having worked at the docks.  (Tr. 393)  Dr. Davis found Weidman was limited in his math skills, and was limited in his abilities to think logically and use common sense judgment.  (*Id.*)

Weidman stated that he went to bed at 10 P.M, got up at 6 A.M., watched television all day, and sometimes took naps.  (Tr. 393)  Weidman drove to Dr. Davis's office and was able to ride busses.  (Tr. 392)  He reported that he occasionally cooked for himself, would do some dishes, help clean "if his back is not acting up," bathed, shaved, changed his clothing, and dressed himself, but did not do laundry, yard work, or grocery shopping.  (Tr. 393)

Dr. Davis diagnosed Weidman with adjustment disorder with mixed disturbance of emotions and conduct and other personal history of psychological trauma.  (Tr. 395)  Dr. Davis opined that Weidman could understand, remember, and carry out simple instructions and was capable of multi-tasking.  (Tr. 394)  Dr. Davis noted that Weidman did not seem to suggest that he had any difficulties dealing with stresses and pressures in his work setting.  (Tr. 395)  Dr. Davis stated that Weidman was very opinionated about things, and opined this might interfere with his ability to get along with people other than those who think exactly as he does.  (*Id.*)  Dr. Davis opined Weidman presented with the ability to think logically and use common sense and judgment.  (Tr. 396)  Dr. Davis opined that Weidman was capable of money management, should he be granted benefits.  (*Id.*)

### 3.    Dimitri Teague, M.D. and William Bolz, M.D. - State Agency Physicians

State agency physicians Dimitri Teague, M.D. and William Bolz, M.D., who assessed Weidman's residual function capacity On January 17, 2015 (Tr. 258-60) and On March 28, 2015

(Tr. 241-43), respectively, reached the same conclusions regarding Weidman's residual function capacity. Only Dr. Teague's opinion is summarized below.

Dr. Teague opined that Weidman could: occasionally lift twenty pounds; frequently lift ten pounds; walk, stand, or sit six hours in an eight-hour workday; and had an unlimited capacity to push and/or pull, other than the limitations on his ability to lift and/or carry. (Tr. 258) Dr. Teague stated that Weidman's facet arthritis in his back, poor body mechanics, and ability to lift twenty pounds occasionally and ten pounds frequently supported these exertional limitations. (*Id*.) Dr. Teague opined that Weidman could occasionally engage in stooping, and could frequently engage in climbing ramps, stairs, ladders, ropes, and scaffolds, balancing, kneeling, crouching, and crawling based on Weidman's ability to stoop occasionally, trunk flexion of 70 degrees, and pain at 45 degrees. (Tr. 258-59) Dr. Teague found Weidman had no manipulative limitations. (Tr. 259) Dr. Teague found Weidman's vision was limited in the following areas: near and far acuity; depth perception; accommodation; color vision; and field of vision in his left eye based on his lack of vision in his left eye and effective monocular vision. (*Id*.) Dr. Teague noted that Weidman's field of vision was limited on his left side and he would not be able to see peripherally. (*Id*.) Dr. Teague opined Weidman should avoid even moderate exposure to hazards, could not do commercial driving, and should avoid tasks that require keen binocular and peripheral vision. (Tr. 260)

### D.  Testimonial Evidence

#### 1.  Complainant's Testimony

At the May 12, 2016 administrative hearing, Weidman testified that that he was 48 years old. (Tr. 209) He stated that he quit school in the tenth grade and did not obtain a G.E.D. (*Id*.)

Weidman stated he lived with his girlfriend and his 27-year-old son, but did not live with his other two children.  (Tr. 210)

Weidman stated he was unemployed and had last worked in 2013, when he did pickup and delivery work for Volunteers for America.  (*Id.*)  He said his job involved lifting donations, including furniture, and he quit because it was "taking too much of a toll" on his back.  (Tr. 211)  Weidman testified that he had also worked as a yard jockey at Container Port Group, but left due to lack of steady work hours.  (Tr. 211-12)  He stated that he worked as a dock worker and tow motor driver at Vitran Express, but left after the company's ownership changed, he moved, and no longer saw "eye-to-eye" with the employer.  (Tr. 213)  He stated that he initially hurt his back while working as a tow motor operator and dock worker.  (*Id.*)

Weidman stated he felt he was disabled because he could not do heavy lifting, standing was too difficult, and he was depressed about everything.  (Tr. 214)  He stated that he constantly used a TENS unit, had a bone spur on his heel, and possibly suffered from planar fasciitis.  (*Id.*)  Weidman stated he was taking Hydrocodone, Vicodin, Gabapentin, Naproxen, Atenolol, Lanacane cream, and Cyclobenzaprine for his pain.  (Tr. 215-16)

Weidman stated he did not know how much he could lift. (Tr. 217)  He stated he could sit for ten to fifteen minutes before having to stand.  (*Id.*)  Weidman said he could stand for approximately ten minutes, and would do so while washing dishes and when shaving.  (*Id.*)  He stated he would lean on something while standing, otherwise he would experience pain in his lower back that would cause upper back pain, back spasms, stomach aches, and leg numbness. (Tr. 220-21)  He stated that he would experience leg numbness that would last a few minutes or as long as he walked.  (Tr. 221)  He stated he had a cane, but lost it (Tr. 218), and would use a

recliner because it was more comfortable when his feet were elevated at hip height.  (Tr. 221)

Weidman stated that he would sometimes fall because his leg was numb.  (Tr. 225)

Weidman stated that he had trouble getting along with people on the job because he does

not like crowds.  (*Id.*)  He said he did not know whether he could take orders from a boss or learn

how to do a job.  (Tr. 219)  He said that he did not attend counselling but did see a psychiatrist

when he initially hurt his back.  (Tr. 225)  He stated he was depressed because he could no

longer take care of his wife and kids.  (Tr. 226)

Weidman stated that during his days he gets up, walks around, and sits down and that he

was affected by the weather, including rain and extreme heat or cold.  (Tr. 219-220)  He stated

that he would watch television for ten to fifteen minutes, but would not watch movies because it

required him to sit too long.  (*Id.*)  Weidman stated he had trouble both falling and staying asleep

due to spasms in his low to mid back and would get up at 4:30 or 5:30 A.M.  (Tr. 222)  He stated

that he washed dishes and went grocery shopping sometimes.  (Tr. 223)  He stated that he was

not sure if he could lift a ten pound bag of potatoes, but could repetitively lift a gallon of milk

three times.  (Tr. 223)  Weidman stated that he shaves and showers himself with difficulty.  (Tr.

224)

### 2.      Vocational Expert Testimony

Vocational Expert ("VE"), Kathleen Reis, described Weidman's past jobs and stated that

she had no objection to the ALJ considering the jobs as past relevant work.  (Tr. 227)  The ALJ

then asked the VE to assume a hypothetical individual with Weidman's past jobs, limited

peripheral vision in his left eye, limited to light work, who could frequently climb ramps or

stairs, frequently climb ladders, ropes, or scaffolds, frequently balance, occasionally stoop,

frequently kneel, crouch, or crawl, and who must avoid even moderate exposure to hazards.  (Tr.

227-28)  The ALJ stated that the hypothetical individual could perform simple, routine, and repetitive tasks in a static setting where changes were explained in advance, and occasionally interact with supervisors, coworkers and the public if that interaction was limited to speaking and signaling.  (Tr. 228)  The VE testified that the hypothetical individual could not perform Weidman's past work, but could perform other jobs such as merchandise worker, mailroom clerk, mail clerk outside the post office, or housekeeping cleaner.  (*Id.*)

The ALJ asked the VE to assume the same hypothetical individual, but limited to sedentary work.  (Tr. 229)  The VE stated that the hypothetical individual could not perform Weidman's past work, but could perform other jobs such as ticket counter, document preparer, or addresser.  (*Id.*)

The ALJ asked the VE to assume the individual from the second hypothetical, who would also be off task twenty percent of the time.  (*Id.*)  The ALJ also asked VE to consider someone who would be absent two times per month on an ongoing basis.  (Tr. 230)  The VE stated that there would be no work sustainable under either of those conditions.  (Tr. 230)

Weidman's attorney then asked the VE to assume a person with a tenth grade education, who could: lift ten to fifteen pounds occasionally and less than ten pounds frequently; walk, stand, or sit four hours a day, no more than thirty minutes at a time; and occasionally climb and balance.  (Tr. 231)  The attorney stated that the individual would have to move around for two to three minutes when changing postures and would be off task ten percent of the day.  (Tr. 231-32)  The VE responded that the hypothetical individual would be right at the threshold of what employers would accept, because leaving the work station twice an hour for an unauthorized break would likely be against company policy and could lead to disciplinary action or termination.  (Tr. 232)

11

IV.    **The ALJ's Decision**

The ALJ's May 20, 2016 decision contained the following paraphrased findings:

1. Weidman met the insured status requirements of the Social Security Act through December 31, 2017 (Tr. 186);

2. Weidman had not engaged in substantial gainful activity since September 29, 2013, the alleged onset date (20 C.F.R. 404. 1571 *et seq.*) (*id.*);

3. Weidman had the following severe impairments: degenerative disc disease of the lumbar spine, obesity, loss of vision on the left, and affective disorder. (20 C.F.R. 404.1520(c)) (*id.*);

4. Weidman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526) (Tr. 187);

5. After careful consideration of the entire record, the ALJ found that Weidman had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) except for the following limitations. Weidman can frequently climb ramps and stairs, as well as ladders, ropes, or scaffolds. Weidman can frequently balance. Weidman can occasionally stoop. Weidman can frequently kneel, crouch, or crawl. Weidman has limited peripheral vision on the left side. Weidman must avoid even moderate exposure to workplace hazards, such as unprotected heights, moving machinery, and commercial driving. Weidman can perform simple, routine, and repetitive tasks in a setting where changes are explained in advance. Weidman can occasionally interact with supervisors, coworkers, and the public if that interaction is limited to speaking and signaling as it is defined in the SCO (Tr. 189);

6. Weidman is unable to perform any past relevant work (20 C.F.R. 404.1565) (Tr. 195);

7. Weidman was born on August 18, 1967 and was 46 years old , which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563) (*id.*);

8. Weidman has a limited education and is limited to communicate in English (20 C.F.R. 404.1564) (*id.*);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (*id.*);

10. Considering Weidman's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Weidman can perform (20 CFR 404.1569 and 404.1569(a)) (*id*);

11. Weidman has not been under a disability, as defined in the Social Security Act, from September 29, 2013 through May 20, 2016 (20 C.F.R. 404.1520(g)) (Tr. 196).

Based on these findings, the ALJ determined that Weidman was not disabled from September 29, 2013 through May 20, 2016, the date of his decision.  (Tr. 196)

## V.    Law and Analysis

Weidman alleges that the RFC is not supported by substantial evidence due to three errors: (1) the ALJ failed to state valid reasons for rejecting the opinion of treating source, Dr. Jared Placeway; (2) the ALJ did not properly evaluate Weidman's credibility; and (3) the ALJ did not meet his burden at Step Five of the Sequential Evaluation.  For the convenience of the court, the undersigned discusses the errors in a different order than presented by Weidman.

### A.    Standard of Review

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and RFC, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

14

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied, because, if not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.

1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    The ALJ Properly Evaluated Weidman's Credibility

Weidman argues that "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether [his] testimony was credible."  ECF Doc. 17, Page ID# 602.  Weidman argues that the ALJ disregarded his need for lumbosacral nerve blocks.  *See id*. at 603 (citing Tr. 46-47, 76-77, 471-472, 479-480).  Weidman also asserts that the ALJ substituted his own medical judgment for that of Weidman's treating physician.  *Id.*  The commissioner counters that the ALJ correctly did not make a specific statement regarding Weidman's credibility; and, instead, described Weidman's treatment history, properly considered the record, and complied with Social Security Ruling 16-3p and *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304 (SSA Oct. 25, 2017).

SSR 16-3p superseded SSR 96-7p on March 28, 2016 and was in effect on the date the ALJ issued his decision.  *Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).  SSR 16-3p eliminates the use of the term "credibility" in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029 at *1.  The new ruling directs the ALJ to consider whether the claimant's statements about the intensity, persistence,

16

and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. *Id.*, 2016 WL 1119029 at *7.

The ALJ found that Weidman's description of his symptoms was not entirely consistent with the evidence of record. (Tr. 192)  The ALJ noted that physical examinations showed some pain on range of motion and lumbar tenderness, but that the examinations routinely demonstrated good strength, sensation, reflexes, and stability. (*Id.*)  The ALJ noted that although Weidman presented with a mildly antalgic gait on a few occasions, generally his gait was normal. (*Id.*)  The ALJ also noted that Weidman's treatment for back pain was very routine and conservative in nature; and there were no surgical interventions for his herniated discs, which suggested Weidman's physicians felt his symptoms could be managed with more conservative measures. (*Id.*)  The ALJ noted that Weidman did not use and had not been prescribed an assistive device, even though Weidman alleged that he could not walk more than 10 minutes due to pain. (Tr. 189, 192, 218)  The ALJ noted that diagnostic imaging of Weidman's lumbar spine showed minor findings, degenerative changes with no acute osseous abnormality, and mild foraminal stenosis. (Tr. 189, 413-14, 431-32, 468-69)  The commissioner also points out that Weidman reported to his medical providers that he was riding his bike two or three times per week, which is inconsistent with Weidman's allegations regarding his physical limitations. ECF Doc. 18, Page ID #621 (citing Tr. 147, 159, 490, 495).

Weidman argues that the ALJ's analysis was prejudicial because the ALJ "disregarded" Weidman's need for lumbosacral nerve blocks. ECF Doc. 17, Page ID# 602 (citing Tr. 46-47, 76-77, 471-72, 479-80).  This argument is unavailing.  The ALJ noted that Weidman received lumbosacral epidural steroid injections and reported his pain returned within days of the injections. (Tr. 191, 471, 479)  The commissioner and Weidman dispute whether Weidman's

17

epidural steroid injections performed in sterile conditions with fluoroscopic guidance were "surgical interventions."  ECF Docs. 18 and 19, Page ID# 620, 648.  Weidman's medical records indicate that he had no surgical history (Tr. 139, 413) and courts have found that epidural injections are less invasive than surgical procedures and can be characterized as a conservative course of treatment.  *See, e.g. Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) (noting claimant did not feel her condition warranted a surgical procedure and opted for less invasive epidural injections and pain management therapy); *Taylor v. Berryhill*, No. 2:16-CV-1118, 2018 WL 947245, at *10 (S.D. Ohio Feb. 20, 2018) (finding the ALJ reasonably considered plaintiff's conservative treatment consisting of nerve blocks and medications); *Alcorn v. Colvin*, No. CV 15-127, 2016 WL 5030362, at *4 (E.D. Ky. Sept. 19, 2016).  Weidman also cites to several medical records to attempt to argue that his treatment was not routine or conservative (ECF. Doc. 19, Page ID# 649), however none of these records indicates Dr. Placeway prescribed more intense or less conservative treatments.  Rather, Weidman's physicians prescribed treatments, including medications (Tr. 41, 61, 118, 134), epidural injections or facet blocks (Tr. 61, 118, 134), lumbar facet RFA (Tr. 41, 61), and home exercise (Tr. 41, 118, 176-77, 192, 409, 412, 428, 436, 440, 441, 477, 488, 509).

Thus, despite Weidman's argument, the ALJ was required to consider these inconsistencies and treatment options.  *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 473 (6th Cir. 2014) (finding that had the claimant "suffered from severe pain associated with her back condition, the medical records would have revealed severe back or leg abnormalities, abnormal functioning on physical exams, recommendations for more aggressive treatment, and more significant doctor-recommended functional limitations"); *see also McKenzie v. Comm'r of*

*Soc. Sec.*, No. 99-3400, 2000 WL 687680, at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non aggressive treatment.").

"Upon review, we are to accord the ALJ's determinations of credibility great weight and deference[,] particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 556 (6th Cir. 2016) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.2003)).  In this case, the ALJ set forth the various factors that he considered in his assessment, including specific citations to medical records, the diagnostic imaging, the fact that Weidman did not need an assistive device to ambulate, and Weidman's treatment history.  (Tr. 192)  Thus, the ALJ complied with the regulations, and his decision not to accept Weidman's subjective complaints was supported by substantial evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").

### C.    The ALJ Properly Evaluated the Opinion of Treating Physician Dr. Placeway

Weidman argues the ALJ failed to state valid reasons for failing to give great weight to the opinion of treating physician, Dr. Placeway.  ECF Doc. 17, Page ID# 597.  The commissioner counters that the ALJ gave numerous good reasons for the weight he accorded Dr. Placeway's opinion.  ECF Doc. 18, Page ID# 622.

Evidence from doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-

supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If an ALJ does not give the treating source opinion controlling weight, the ALJ must apply several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 416.927(c). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); *see also Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.*" *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)).

The ALJ gave Dr. Placeway's opinion "little weight." (Tr. 192) He stated:

> The treating source statement is entitled to little weight, for several reasons. Dr. Placeway had seen the claimant for only a few office visits over a period of about a year prior to the September 2015 "disability exam," and had not recommended activity restrictions due to the claimant's back impairment. There were no limits placed by any treating source, until the claimant specifically requires a disability evaluation. In fact, his physicians encouraged him to engage in regular exercise for weight loss and health management. Dr. Placeway also appeared to be relying heavily on the claimant's subjective allegations, as his opinion was generally in line with the claimant's reports during that evaluation. Further, Dr. Placeway has prescribed only a conservative and routine course of treatment, inconsistent with the relatively extensive limitations he set forth in his opinion. In addition, while the physician found some reduced range of motion and tenderness on exam, the findings of normal strength throughout the extremities is inconsistent with the limitation on lifting only 10 pounds or walking only a few minutes at a time.

(Tr. 192-93)

The ALJ gave Dr. Placeway's opinion "little weight" because he found Dr. Placeway had only seen Weidman for a few office visits over a period of about a year and neither Dr. Placeway nor any other treating source had placed any activity restrictions on Weidman due to his back impairment. (Tr. 192) It is true that Weidman began treatment with Dr. Placeway in October 2014 and only saw Dr. Placeway approximately four times before Dr. Placeway issued his medical source statement in September of 2015. (Tr. 409-12, 421, 436-40, 458-59, 465-70). No medical record indicates that Dr. Placeway or any other health care provider recommended limits or activity restrictions due to Weidman's back impairment until Weidman "return[ed] for a disability evaluation" on September 8, 2015, shortly before Dr. Placeway issued his medical source statement. (Tr. 192, 409, 412, 440, 441, 465, 477, 486, 488, 493-494) Rather, Weidman's physicians encouraged him to participate in physical therapy and engage in regular exercise for weight loss and health management. (Tr. 176-77, 192, 409, 412, 428, 436, 440, 441, 477, 488, 509)

21

The ALJ also found that Dr. Placeway appeared to be relying on Weidman's subjective allegations, because the opinion was generally in line with the Weidman's reports during the evaluation.  (Tr. 192)  On September 8, 2015, Weidman reported to Dr. Placeway that he could stand for only 5-6 minutes and 30 minutes over an eight-hour period, sit for 30-45 minutes without interruption or 1 to 1.5 hours over an eight-hour period, and walk for thirty minutes over an eight-hour period.  (Tr. 465)  Weidman reported that he could not estimate how much he could lift and that it was very difficult for him to bend forward to pick anything up.  (*Id.*)  Dr. Placeway then opined in his medical source statement that Weidman could sit, stand, or walk thirty minutes without interruption or a total of 3-4 hours in an eight-hour work day and lift 10-15 pounds occasionally and less than 10 pounds frequently.  Dr. Placeway stated that Weidman's difficulty sitting for more than a few minutes in the clinic, his need to frequently change positions, and his herniated discs and facet arthropathy that made bending and lifting difficult supported Dr. Placeway's opinions.  (Tr. 458-59)  I find Dr. Placeway's opinions differed somewhat from Weidman's subjective statements and were based on Dr. Placeway's own observations.

The ALJ found that the limitations set forth in Dr. Placeway's opinions were inconsistent with the conservative and routine course of treatment he prescribed for Weidman.  (Tr. 192)  As discussed above, the undersigned finds substantial evidence supports this conclusion.

Weidman argues that the ALJ "played doctor and chose to ignore the examinations of Dr. Placeway and his staff, the July 2015 MRI, the prescription for pain medications, and the fact that Weidman had several sets of lumbosacral epidural steroid injections under surgical conditions."  ECF Doc. 17, Page ID# 600.  I disagree.  As discussed above, the ALJ's discussion of the medical record noted that Weidman's physical examinations showed some pain on range

of motion, lumbar tenderness, and an antalgic gait on a few occasions, but his examinations routinely demonstrated good strength, sensation, reflexes, stability, and normal gait. (*See* Tr. 190-193; *see also* Tr. 40-41, 60-61,115, 133-134, 147, 151, 411, 439, 476, 485, 493, 508) The ALJ also found that Dr. Placeway's findings were inconsistent with the diagnostic imaging. (Tr. 189, 191) The ALJ also cited to and discussed Weidman's July 2015 MRI, although the ALJ stated that the MRI of Weidman's lumbar spine occurred on June 30, 2015. (Tr. 191, 468-69) The ALJ noted that the MRI demonstrated normal disc height, no spinal canal stenosis, and facet hypertrophy more pronounced on the left producing mild foraminal stenosis, and no LS or S1 root compromise. (*Id.*) The ALJ noted that the x-ray of Weidman's lumbar spine taken on November 9, 2012 "demonstrated minor spurring at Ll-2, with some degenerative arthritic changes involving the facet joints at LS-S1." (Tr. 189) (citing Tr. 412) The ALJ also noted that Weidman was prescribed Vicodin and other medications and that he received lumbosacral epidural steroid injections. (Tr. 190-192) Thus, the ALJ analyzed and discussed the medical record and did not merely "play doctor" as Weidman alleges.

The commissioner argues the limitations described in Dr. Placeway's medical source statement are inconsistent with the "generally mild findings upon examination," including normal strength throughout extremities and only reduced range of motion and mild tenderness on examination. ECF Doc. 18, Page ID# 623. SSR 16-3p states:

> [A]n individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

SSR 16-3p, 2017 WL 5180304, at *5.  The ALJ noted that on many occasions Weidman's

medical service providers found that Weidman's muscle strength was within normal limits.  (Tr.

40, 60, 115, 133, 151, 190, 191, 193, 411, 439, 476, 485, 493, 508)  The record confirms these

observations.  On November 4 and 11, 2014, Weidman reported decreased core strength and Dr.

Placeway found 5/5 strength in all muscles other than 4+/5 strength in the Weidman's gluteus

maximus and poor strength in his transversus abdominis.  (Tr. 399-400, 405-06)  However, Dr.

Placeway noted no further muscle weakness and found 5/5 strength in Weidman's extensor

hallucis longus (EHL), dorsalis flexors (DF), plantar flexors (PF), knee flexors (KF), knee (KE),

and hip flexors (HF) muscles during manual muscle testing from March 2015 to March 2016.

(Tr. 40, 60, 115, 133, 151, 439, 476, 485, 493)

Weidman states that "[a]lthough [he] did not treat for his affective disorder, it was

diagnosed by Dr. Richard Davis during the consultative examination" and cites to medical

records stating that he is blind in his left eye.  ECF Doc. 17, Page ID# 600-01 (citing Tr. 395).

These statements are irrelevant because Dr. Placeway did not include any limitations in his

medical source statement regarding Weidman's alleged mental or visual impairments.  (Tr. 458-

59)

Weidman next argues that the ALJ "erroneously placed more weight on the opinion of

the State Agency medical consultant," because the state agency medical examiner did not

evaluate all of the medical evidence, such as the medical records Weidman submitted after the

the administrative hearing or Weidman's lumbar MRI.  ECF Doc. 17, Page ID# 601 (citing Tr.

193).  The commissioner counters that Weidman has failed to offer any argument or demonstrate

that the new evidence would have changed the medical consultants' opinions and that the

"diagnostic imaging and physical-examination findings were generally consistent over the

record." *See id.* at 627-28 (citing *Kelly v. Comm'r of Soc. Sec.,* 314 F. App'x 827, 831 (6th Cir. 2009).  I agree with the commissioner.

Courts have noted that "[t]here will always be a gap between the time the agency experts review the record and give their opinion . . . and the time the hearing decision is issued." *Kelly v. Comm'r of Soc. Sec.,* 314 F. App'x 827, 831 (6th Cir. 2009) (quoting the underlying magistrate judge opinion).  "Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Id.*  Weidman has failed to identify specific findings in any medical records demonstrating that Weidman had limitations beyond those included in the RFC determination.

The ALJ found the opinion of the state agency medical consultant "more consistent with the relatively unremarkable physical examination findings, the conservative treatment, and [Weidman's] retained ability to perform activities of daily living independently." (Tr. 193) With regard to Weidman's activities of daily living, the ALJ noted that Dr. Placeway found Weidman was able to ambulate without devices and perform activities of daily living at an independent level, but with difficulty dressing at times.  (Tr. 95, 191, 465)  Other medical service providers also found Weidman was independent with his ADLs such as self-care, but had difficulty shopping, lifting, and carrying.  (Tr. 404)  In a call regarding his activities of daily living, Weidman stated that although sometimes shaving and standing on a hard floor were difficult, he still was able to make a few meals.  (Tr. 345)  However, when testifying at the administrative hearing, Weidman stated that he was "done cooking" and his girlfriend did most of the chores, although he would go grocery shopping with her once in a while and wash the dishes.  (Tr. 217, 223)  Weidman also reported improved ability to walk upright and increased activity after the facet block treatment.  (Tr. 56)  He even reported that he went deer hunting in

25

December 2015, three months after Dr. Placeway prepared his medical source statement.  (Tr. 67)  Weidman has not shown that the ALJ erred in relying upon the state agency medical consultant opinion.

A review of the record compels the conclusion that the ALJ did not err in declining to give great weight to Dr. Placeway's opinion.

### D.    The ALJ Met His Burden at Step Five of the Sequential Analysis

Weidman argues that the ALJ did not meet his burden at Step Five of the sequential evaluation because he "disregarded any objective or subjective evidence which would have resulted in a finding of disabled."  *See* ECF. Doc. 17, Page ID# 603-04.  The commissioner counters that the ALJ's RFC determination was consistent with the medical record as a whole, including the diagnostic imaging, physical and mental-status examination findings of Weidman's medical providers, and the medical opinions of state-agency medical consultants.  *See* ECF Doc. 18, Page ID# 627.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments."  *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir.2010).  "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs,* 987 F.2d 1230, 1235 (6th Cir.1993)).  At the fifth step of the disability determination, the claimant retains the burden of proving his lack of residual function capacity.  *Jordan v. Comm'r of Soc. Sec*., 548 F.3d 417, 423 (6th Cir. 2008).  If the ALJ's hypothetical question has support in

the record, it need not reflect a claimant's unsubstantiated complaints.  *See Blacha v. Sec'y of Health & Human Servs.,* 927 F.2d 228, 231 (6th Cir. 1990).

Weidman argues that the hypotheticals the ALJ posited to the VE, which included the limitation that Weidman has limited peripheral vision in his left eye, did not accurately reflect Weidman's limitations because he "was blind in his left eye and would have no peripheral vision on the left" and "had blurred vision in his right eye."  *See* ECF. Doc. 17, Page ID# 604 (citing Tr. 228, 501).  The commissioner counters that the ALJ accommodated Weidman's left eye blindness with the RFC limitation that Weidman must avoid even moderate exposure to workplace hazards, such as unprotected heights, moving machinery, and commercial driving because of the limited peripheral vision on his left side.  *See* ECF Doc. 18, Page ID# 627 (citing Tr. 188, 193).  The commissioner argues that the opinions of Dr. Teague, a state agency medical consultant, support the RFC, while Weidman cites no evidence supporting more significant limitations.  *See id.* at 628.  I agree.

Dr. Butler, a state-agency medical consultant who evaluated Weidman on November 9, 2012 in connection with a prior application, examined Weidman and found that he had good vision in his right eye and 20/20 vision in both eyes, uncorrected.  (Tr. 193, 447)  An optometrist examined Weidman on May 18, 2015 regarding his complaints of blurred vision in his right eye and found Weidman had 20/20 vision in his right eye and recommended over the counter reading glasses, because no prescription was needed.  (Tr. 191, 500-504)  State agency physicians Dr. Teague and Dr. Bolz examined Weidman's medical record and opined that Weidman's field of vision was limited on his left side and he would not be able to see peripherally.  (Tr. 242-43, 259)  They also opined that Weidman should avoid even moderate exposure to unprotected heights and operating heavy machinery and should not do commercial driving.  (Tr. 243, 260)

As the commissioner correctly notes, the ALJ gave weight to Dr. Teague's opinion and incorporated the limitations Dr. Teague identified into the RFC determination.  (Tr. 188, 193)  Accordingly, the undersigned finds substantial evidence supports the ALJ's RFC determination regarding Weidman's visual limitations.

Weidman also argues that the ALJ's hypothetical questions to the VE failed to encompass the effects of Weidman's back pain.  *See* ECF Doc. 17, Page ID# 604.  Weidman argues the ALJ failed to incorporate certain limitations "set forth by Weidman's treating physician," including limitations that "a person would be able to stand and walk three to four hours a day, no more than 30 minutes at a time, sit three to four hours a day, no more than 30 minutes at a time" and "would need to walk around for two to three minutes each time he would change position."  *Id.* at 605 (citing Tr. 231).  As an initial matter, the court finds Weidman's assertion that he "would need to walk around for two to three minutes each time he would change position" does not accurately characterize Dr. Placeway's medical source statement.  Dr. Placeway only opined that Weidman would require "multiple episodes of position changes" and would need to take unscheduled breaks about two times per day.  (Tr. 458-59)  Moreover, as stated above, the undersigned finds substantial evidence supported the ALJ's decision to give Dr. Placeway's decision little weight.

Weidman's final argument is that the ALJ erred by not limiting Weidman to no more than the sedentary level of exertion and that this matter should be remanded because Weidman had turned 50 years old and changed age categories after the ALJ's decision.  ECF Doc. 17, Page ID# 606.  The commissioner notes that the only evidence Weidman cites in support of his argument is Dr. Placeway's opinion.  ECF Doc. 18, Page ID# 629.  The commissioner argues that even if Dr. Placeway's opinions were fully accepted, it would not support a finding that

Weidman should be restricted to sedentary work.  *Id.*  Specifically, the commissioner argues that Dr. Placeway opined Weidman could only sit for 30 minutes without interruption or three to four hours in an eight-hour workday, but "[s]edentary work involves sitting most of the time, [and] may involve walking or standing for brief periods of time."  *Id.* (citing Dictionary of Occupational Titles, App'x C-Components and Definition Trailer, 1991 WL 688702 (4th ed. 1991) and 20 C.F.R. § 404.1567(a)).

"[T]he relevant time for determining a claimant's age in applying the regulations is the date of the ALJ's decision."  *Maziarz v. Sec'y of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987).  Weidman was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date and 48 years old on May 20, 2016, the date the ALJ issued his decision.  (Tr. 181, 195, 209)  Weidman did not indicate that he asked the ALJ to apply another age category.  I find the ALJ did not err in limiting Weidman to light work as defined in 404.1567(b) with the additional limitations included in the RFC.

## VI.    Recommendations

Because (1) substantial evidence supported the ALJ's conclusion that Weidman's description of his symptoms was not entirely consistent with the evidence of record; (2) the ALJ properly applied the treating source rule; and (3) the ALJ met his burden at Step Five of the Sequential Analysis, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: May 29, 2018

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).